No. 94–8262. LACKEY *v.* TEXAS. Ct. Crim. App. Tex. Certiorari denied.

Memorandum of JUSTICE STEVENS, respecting the denial of certiorari.

Petitioner raises the question whether executing a prisoner who has already spent some 17 years on death row violates the Eighth Amendment's prohibition against cruel and unusual punishment. Though the importance and novelty of the question presented by this certiorari petition are sufficient to warrant review by this Court, those factors also provide a principled basis for postponing consideration of the issue until after it has been addressed by other courts. See, *e. g., McCray* v. *New York,* 461 U. S. 961 (1983) (STEVENS, J., respecting denial of certiorari).

Though novel, petitioner's claim is not without foundation. In *Gregg* v. *Georgia,* 428 U. S. 153 (1976), this Court held that the Eighth Amendment does not prohibit capital punishment. Our decision rested in large part on the grounds that (1) the death penalty was considered permissible by the Framers, see *id.,* at 177 (opinion of Stewart, Powell, and STEVENS, JJ.), and (2) the death penalty might serve "two principal social purposes: retribution and deterrence," *id.,* at 183.

It is arguable that neither ground retains any force for prisoners who have spent some 17 years under a sentence of death. Such a delay, if it ever occurred, certainly would have been rare in 1789, and thus the practice of the Framers would not justify a denial of petitioner's claim. Moreover, after such an extended time, the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted. Over a century ago, this Court recognized that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley,* 134 U. S. 160, 172 (1890).

If the Court accurately described the effect of uncertainty in *Medley*, which involved a period of four weeks, see *ibid.*, that description should apply with even greater force in the case of delays that last for many years.* Finally, the additional deterrent effect from an actual execution now, on the one hand, as compared to 17 years on death row followed by the prisoner's continued incarceration for life, on the other, seems minimal. See, *e. g.*, *Coleman* v. *Balkcom*, 451 U. S. 949, 952 (1981) (STEVENS, J., respecting denial of certiorari) ("[T]he deterrent value of incarceration during that period of uncertainty may well be comparable to the consequences of the ultimate step itself"). As Justice White noted, when the death penalty "ceases realistically to further these purposes, . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman* v. *Georgia*, 408 U. S. 238, 312 (1972) (opinion concurring in judgment); see also *Gregg* v. *Georgia*, 428 U. S., at 183 ("[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering").

Petitioner's argument draws further strength from conclusions by English jurists that "execution after inordinate delay would

---

*See also *People* v. *Anderson*, 6 Cal. 3d 628, 649, 493 P. 2d 880, 894 (1972) ("The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture") (footnote omitted); *Furman* v. *Georgia*, 408 U. S. 238, 288–289 (1972) (Brennan, J., concurring) ("[T]he prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death"); *Solesbee* v. *Balkcom*, 339 U. S. 9, 14 (1950) (Frankfurter, J., dissenting) ("In the history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon"); *Suffolk County District Attorney* v. *Watson*, 381 Mass. 648, 673, 411 N. E. 2d 1274, 1287 (1980) (Braucher, J., concurring) (death penalty is unconstitutional under State Constitution in part because "[i]t will be carried out only after agonizing months and years of uncertainty"); *id.*, at 675–686, 411 N. E. 2d, at 1289–1295 (Liacos, J., concurring).

have infringed the prohibition against cruel and unusual punishments to be found in section 10 of the Bill of Rights 1689." *Riley* v. *Attorney General of Jamaica,* [1983] 1 A. C. 719, 734, 3 All E. R. 469, 478 (P. C. 1983) (Lord Scarman, dissenting, joined by Lord Brightman). As we have previously recognized, that section is undoubtedly the precursor of our own Eighth Amendment. See, *e. g., Gregg* v. *Georgia,* 428 U. S., at 169–170; *Harmelin* v. *Michigan,* 501 U. S. 957, 966 (1991) (SCALIA, J., concurring in judgment).

Finally, as petitioner notes, the highest courts in other countries have found arguments such as petitioner's to be persuasive. See *Pratt* v. *Attorney General of Jamaica,* [1994] 2 A. C. 1, 4 All E. R. 769 (P. C. 1993) (en banc); *id.,* at 32–33, 4 All E. R., at 785–786 (collecting cases).

Closely related to the basic question presented by the petition is a question concerning the portion of the 17-year delay that should be considered in the analysis. There may well be constitutional significance to the reasons for the various delays that have occurred in petitioner's case. It may be appropriate to distinguish, for example, among delays resulting from (a) a petitioner's abuse of the judicial system by escape or repetitive, frivolous filings; (b) a petitioner's legitimate exercise of his right to review; and (c) negligence or deliberate action by the State. Thus, though English cases indicate that the prisoner should not be held responsible for delays occurring in the latter two categories, see *id.,* at 33, 4 All E. R., at 786, it is at least arguable that some portion of the time that has elapsed since this petitioner was first sentenced to death in 1978 should be excluded from the calculus.

As I have pointed out on past occasions, the Court's denial of certiorari does not constitute a ruling on the merits. See, *e. g., Barber* v. *Tennessee,* 513 U. S. 1184 (1995); *Singleton* v. *Commissioner,* 439 U. S. 940, 942 (1978) (STEVENS, J., respecting denial of certiorari). Often, a denial of certiorari on a novel issue will permit the state and federal courts to "serve as laboratories in which the issue receives further study before it is addressed by this Court." *McCray* v. *New York,* 461 U. S., at 963. Petitioner's claim, with its legal complexity and its potential for far-reaching consequences, seems an ideal example of one which would benefit from such further study.

JUSTICE BREYER agrees with JUSTICE STEVENS that the issue is an important undecided one.