JUSTICE LEAPHART,
specially concurring.
I concur with the decision of the Court and write separately to express my concerns about Issue 7, the scope of our review in determining proportionality of the sentence under § 46-18-310(3), MCA; and Issue 9, cruel and unusual punishment.

Scope of Review

While I agree that, under existing precedent, the sentence imposed was not disproportionate to the penalty imposed in similar Montana cases, I do not agree with the holding in State v. Coleman (1979), 185 Mont. 299, 605 P.2d 1000, and reiterated in this opinion that when we engage in a proportionality review, we are restricted to comparing cases in which the death penalty was proposed by the prosecution and which were appealed to this Court. In other words, we cannot consider those cases in which (1) the prosecutor could have sought the death penalty but, for any number of reasons chose not to, or (2) the prosecutor sought the death penalty but the judge, for any number of reasons, chose not to impose the death sentence.
In reviewing the question of proportionality, the scope of cases reviewed should hinge upon the similarity of the facts and the charges rather than whether the case came before us on appeal.
Assume that defendants A, B and Smith separately commit double aggravated kidnappings in different counties in the State of Montana which result in the death of their victims. The prosecutor in Smith’s county seeks the death penalty and the judge imposes the death penalty. The prosecutor in A’s county is concerned about the tremendous costs of numerous appeals and appointed counsel which are inherent in imposing the death penalty so he chooses not to seek the death penalty. The prosecutor in B’s county does seek the death penalty, however, the trial judge has religious opposition to the death penalty and chooses to impose a life sentence instead. B does not appeal the sentence.
Under our holding herein, despite the great similarity between the three offenses, we cannot consider the cases of defendants A or B *187 because the death penalty either was not sought or not imposed. In restricting our scope of review to only those cases in which the death penalty was sought or imposed, we cite Coleman for the proposition that “Meniency in one case does not invalidate the death penalty in others.” Coleman, 605 P.2d at 1021.1 do not necessarily disagree with this statement. However, I seriously question whether it is a principle which has any practical application.
We also quote McCleskey v. Kemp (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262, for the proposition that “[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime.” McCleskey, 481 U.S. at 307 n.28, 107 S.Ct. at 1775 n.28. How do we determine whether other defendants were granted “leniency” or “mercy” based upon objective circumstances of the crime or were merely the incidental beneficiaries of other considerations? In my example set forth above, it cannot fairly be said that defendants A and B were “granted leniency.” The fact that they did not receive the death penalty was not attributable to the “objective circumstances of the crime.” Rather, A’s more lenient sentence was due to economic considerations of death penalty cases in general. B’s goodfortune was attributable to the religious beliefs of the trial judge. Considerations of economics and religion are not fact specific and yet they are quite often the driving force behind the choice of whether to seek or impose the death sentence. To categorize all such cases as cases of “leniency” or “mercy” and thus totally disregard them is facile and simplistic — especially given the stakes of the issue being considered.
Both this Court and the United States Supreme Court have recognized that, under our system of justice, there are discretionary stages in which a decisionmaker may remove a defendant from consideration as a candidate for the death penalty. McCleskey, 481 U.S. at 307, 107 S.Ct. at 1775. Due to the human factor in our system of justice, one judge may grant leniency and the other may not. However, the recognition that a judge may, based upon “objective circumstances of the crime” grant leniency, does not relieve us of our duty to ascertain whether a death sentence, when reviewed in a state-wide perspective, is arbitrary and capricious. If murder defendants in county C are subjected to death penalties because that county is not deterred by the costs of pursuing a death sentence while murder defendants in the less wealthy county of D, get off with life imprisonment, that, in my view, is not attributable to a “leniency” factor inherent in our less than perfect system of justice. Rather it is arbitrary and capricious. *188 Likewise, if murder defendants in county E are subjected to death sentences while similar cases across the county line in county F are not because the prosecutor in F, for religious reasons, does not believe in the death penalty — that too suggests caprice. If the present defendant is convicted of double kidnapping resulting in homicides and if there have been ten similar crimes in the state, only one of which has resulted in a sentence of death, are we bound to look only at the one case, ignoring the other nine, and conclude that death would be proportional?
Many judges and legislators wiser than I have wrestled with both the morality and constitutionality of the death sentence. I do not pretend to raise any new questions or offer any new answers. However, in my capacity as an appellate judge, I am at a loss as to how I can truly review the proportionality of a death sentence by looking only at similar cases in which the death sentence was proposed or imposed while not considering similar cases in which it was never sought, and asking “why not?”
I recognize that the rationale for limiting proportionality review to cases in which the death penalty was proposed is that only in those cases will a record exist concerning aggravating and mitigating circumstances. In matters of life and death, however, the difficulty of review is hardly a sufficient rationale to ignore a potentially large body of relevant comparable cases. It would be preferable to require prosecutors, in cases which initially satisfy the requirements of § 46-18-303, MCA, (e.g., the prison riot cases which fall within § 46-18-303(1), MCA) to make a record as to why they have chosen not to seek the death penalty. That record could then be filed with the Supreme Court for reference in subsequent proportionality reviews.
Having reviewed the cases of State v. Langford (1991), 248 Mont. 420, 813 P.2d 936, and State v. Dawson (1988), 233 Mont. 345, 761 P.2d 352, as well as the 28 case summaries set forth in Smith’s submission entitled, “Proportionality Basis” — I conclude, that the sentence imposed is not out of proportion to the sentence imposed in those cases most similar in this state; that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the evidence supports the judge’s findings concerning the existence or nonexistence of aggravating and mitigating circumstances. Section 46-18-310, MCA.
Despite my reservations about the scope of review, I conclude that under either the restricted Coleman standard or the more expansive *189 standard I have suggested, the sentence imposed was not out of proportion to similar cases.

Cruel and Unusual Punishment

Although I concur in the Court’s conclusion on the cruel and unusual punishment issue (Issue 9), I do not agree with all that is said in rejecting the argument that having a defendant on death row for thirteen years is itself cruel and unusual punishment. The majority relies on the fact that this passage of time is attributable to Smith having availed himself of his right to appeal in both the state and federal forums. We cite McKenzie v. Day (Mont. 1995), 57 F.3d 1461, 1467, for the proposition that the delay is “a consequence of our evolving standards of decency, which prompt us to provide death row inmates with ample opportunities to contest their convictions and sentences.”
In reviewing the amount of time that a defendant has spent on death row, a distinction should be drawn between the passage of time due to the mere filing of appeals and petitions and the passage of time attributable to the State’s inability to impose the sentence in accordance with requirements of due process. In other words, it is not sufficient to attribute the delay to our “standards of decency.” That suggests that we, as a society, out of a sense of decency, have provided defendants with a procedure whereby they can challenge their sentences and, if they choose to do so, they must live with the resulting delay. Such a rationale places all the blame for the delay at the feet of the defendant. This blame is misplaced, however, in a case such as this wherein the defendant has not only filed appeals, but has been successful in his federal court appeals. His success points to the fact that the blame properly rests with the State or the courts for having failed to appoint an independent psychiatrist and then having failed to prepare a new presentence investigation.
When a defendant is successful in his appeals, it cannot fairly be said that he is merely filing frivolous appeals in order to buy time. Rather, it raises more serious questions as to how long a defendant can be expected to languish on death row while the State and the trial courts are afforded repeated opportunities to comply with due process.
Assume that a trial court imposed the following sentence: “I hereby sentence you to death. However, I am not going to advise you as to when you will be executed. You may be executed tomorrow, in six months, in two years or perhaps not for thirteen years.” I have little doubt that such a sentence would be considered cruel and unusual *190 punishment under the 8th Amendment and under Article II, Section 22 of the Montana Constitution. Although such a sentence was not imposed in the present case, the end result is no different. Due to procedural problems not attributable to Smith, he has been kept in suspense for some thirteen years as to whether or when he will be executed.
The Court notes that: “It is clear from the record that Smith has benefitted from the appellate and federal review process of which he has availed himself and which has resulted in the delay and the multiple sentencing hearings in this case.” Assuming that Smith wishes to live, that statement is accurate. Any delay in imposition of the death sentence benefits Smith. However, does the Court’s analysis change any if, instead of focusing solely on the benefit to the defendant, we acknowledge that the State has benefitted from Smith’s counsel pointing out errors and from the courts having allowed the State successive chances to do its job correctly?
Short of establishing some arbitrary time period within which a death sentence must be carried out, I see no simple answer to the conundrum which results from the conflict between a defendant’s right to due process and appellate review and his right to be free from cruel and unusual punishment. In the final analysis, I must err on the side of affording the defendant his due process and appellate review, as lengthy as that process may be. Although I concur with the sentence imposed in this case, I have written to express my view that, like Justices Stevens and Breyer in Lackey v. Texas (1995), _ U.S._, 115 S.Ct. 1421,131 L.Ed.2d 304,1 do not treat as completely without merit the argument thát lengthy delays in the imposition of the death sentence may amount to cruel and unusual punishment under the 8th Amendment.