# SUPREME COURT OF THE UNITED STATES

_____

### No. 20A9

_____

## WILLIAM P. BARR, ATTORNEY GENERAL, ET AL. *v.* WESLEY IRA PURKEY

### ON APPLICATION FOR STAY OR VACATUR

### [July 16, 2020]

The application for stay or vacatur presented to THE CHIEF JUSTICE and by him referred to the Court is granted. The District Court's July 15, 2020 order granting a preliminary injunction is vacated.

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, dissenting.

Two days ago, the Federal Government conducted its first execution in nearly two decades. Today, it will conduct its second. Both cases have come before us with the defendants pointing to what I believe are serious legal defects of a kind that have long plagued the administration of the death penalty in the United States. See *Glossip* v. *Gross*, 576 U. S. 863, 908–948 (2015) (BREYER, J., dissenting).

The first case, that of Daniel Lewis Lee, revealed the inherent arbitrariness of the death penalty. Lee was sentenced to death and his codefendant to life even though the two men committed the same crime. See *Barr* v. *Lee, ante,* at 2 (BREYER, J., dissenting); see also *Glossip*, 576 U. S., at 917 ("40 years of further experience [since *Gregg* v. *Georgia*, 429 U. S. 1301 (1976)] make it increasingly clear that the death penalty is imposed arbitrarily"). Lee's case also implicated the problem of excessive delay and the risk of severe and unnecessary suffering brought about by the Government's chosen method of execution. *Lee, ante*, p. \_\_\_ (BREYER, J., dissenting). Today's case, that of Wesley

Purkey, raises similar problems.

Consider the problem of delay. See *Lackey* v. *Texas*, 514 U. S. 1045 (1995) (Stevens, J., memorandum respecting denial of certiorari). Daniel Lee's execution took place more than 20 years after his trial. See *Lee*, *ante*, at 1 (BREYER, J., dissenting). Wesley Purkey was sentenced to death over 16 years ago for a crime committed six years before that. See *United States* v. *Purkey*, No. 4:01–cr–00308, Doc. No. 505 (WD Mo., Jan. 23, 2004); *United States* v. *Purkey*, 428 F. 3d 738, 745 (CA8 2005). Purkey is now 68 years old, frail, and suffering from Alzheimer's disease and other psychiatric conditions. See Report of Dr. Bhushan Agharkar, in No. 1:19–cv–03570, Doc. No. 1–1 (D DC, filed Nov. 26, 2019); Report of Dr. Jonathan DeRight, in No. 1:19–cv–03570–TSC, Doc. No. 1-3 (D DC, filed Nov. 26, 2019). He has undergone many years of what this Court has called the "immense mental anxiety" of confinement on death row awaiting an uncertain date of execution. *In re Medley*, 134 U. S. 160, 172 (1890) (referring to period of *four weeks*); see also *Glossip*, 576 U. S., at 926–929 (BREYER, J., dissenting).

The delay itself undermines the penological rationales for the death penalty: deterrence and retribution. *Id.,* at 929–933; see also *Lee*, *ante,* at 1 (BREYER, J., dissenting). I have previously explained that prolonged delays likely reduce the death penalty's deterrent effect. See *Glossip*, 576 U. S., at 930–932 (dissenting opinion). And after so many years have passed, executing the offender may not serve the interest in retribution either. In Lee's case, for example, the victims' relatives explained that Lee's execution would only "'bring [the] family more pain.'" Demillo, Victims' Relatives Most Vocal Opponents of Man's Execution, Washington Post, July 13, 2020; see also Robertson, She Doesn't Want Her Daughter's Killer To Be Put To Death. Should the Government Listen?, N. Y. Times, Oct. 29, 2019. And Purkey alleges that, in the years since his sentencing, his mental condition has deteriorated to the point where he no

longer understands why he is being executed. See Complaint ¶¶ 20–108, in No. 1:19–cv–03570, Doc. No. 1, ¶¶ 20–108 (D DC, filed Nov. 26, 2019). We have "question[ed] the retributive value of executing a person" under such circumstances. *Ford* v. *Wainwright*, 477 U. S. 399, 409 (1986).

Purkey's case also raises serious problems of proper procedure. See *Purkey* v. *United States*, —- F. 3d —- (CA7 2020). Simplifying the problem, imagine that a death-sentenced defendant's trial or sentencing suffered from his lawyer's constitutionally inadequate performance. Suppose too that his lawyer in his initial habeas proceeding was himself inadequate because he failed to raise the trial lawyer's initial constitutional inadequacy. Can the defendant bring the matter up in a later habeas proceeding, say, a proceeding where he now has a better lawyer? He can sometimes do so where a state conviction is at issue. See *Martinez* v. *Ryan*, 566 U. S. 1 (2012); *Trevino* v. *Thaler*, 569 U. S. 413 (2013). But can he do so where, as here, a federal conviction is at issue? In my view, the question, as presented here, is difficult. On the one hand, we ought not to have a procedural system where challenges to a conviction can go on endlessly. On the other hand, is it consistent with criminal justice principles to allow the execution of a defendant whose conviction rests upon the constitutional inadequacy of a lawyer, when no court has ever adjudicated that inadequacy?

The question reflects the heightened need for reliability in the death penalty context. See *Glossip*, 576 U. S., at 909–910 (BREYER, J., dissenting). The risk of error that we may accept as necessary to the functioning of the system more generally is less tolerable when the punishment is, by definition, irreparable. Yet the requisite opportunities to challenge and then correct errors necessarily entail delay that, in turn, undercuts the penological rationale for the death penalty. In this context, it is especially difficult to reconcile the competing values of finality and accuracy.

I have written about these matters before. See, *e.g., Price* v. *Dunn*, 587 U. S. ___ (2019) (opinion dissenting from denial of application for stay); *Jordan* v. *Mississippi*, 585 U. S. ___ (2018) (opinion dissenting from denial of certiorari); *McGehee* v. *Hutchinson*, 581 U. S. ___ (2017) (opinion dissenting from denial of application for stay of execution); *Reed* v. *Louisiana*, 580 U. S. ___ (2017) (opinion dissenting from denial of certiorari); *Sireci* v. *Florida*, 580 U. S. ___ (2016) (same); *Tucker* v. *Louisiana*, 578 U. S. ___ (2016) (same); *Boyer* v. *Davis*, 578 U. S. ___ (2016) (same). I repeat them here in summary form because the Federal Government has resumed executions after a 17-year hiatus. And the very first cases reveal the same basic flaws that have long been present in many state cases. That these problems have emerged so quickly suggests that they are the product not of any particular jurisdiction or the work of any particular court, prosecutor, or defense counsel, but of the punishment itself. A modern system of criminal justice must be reasonably accurate, fair, humane, and timely. Our recent experience with the Federal Government's resumption of executions adds to the mounting body of evidence that the death penalty cannot be reconciled with those values. I remain convinced of the importance of reconsidering the constitutionality of the death penalty itself.

# SUPREME COURT OF THE UNITED STATES

_____

### No. 20A9

_____

### WILLIAM P. BARR, ATTORNEY GENERAL, ET AL. *v.* WESLEY IRA PURKEY

#### ON APPLICATION FOR STAY OR VACATUR

[July 16, 2020]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG, JUSTICE BREYER, and JUSTICE KAGAN join, dissenting.

In a matter of hours, the Government plans to put to death Wesley Purkey, a 68-year-old federal inmate who has Alzheimer's disease and, according to a recent in-person evaluation by a forensic psychiatrist, "lack[s] a rational understanding of the basis for his execution." Complaint in No. 1:19–cv–3570 (D DC), Exh. 1, Doc. No. 1–1, p. 12 (Purkey Psychiatric Report). Due to these developments and rapid deteriorations in Purkey's mental state, his counsel filed an action in the United States District Court for the District of Columbia. The complaint alleges that under *Ford* v. *Wainwright*, 477 U. S. 399 (1986), Purkey is mentally incompetent to be executed and, at minimum, is entitled to an evidentiary hearing to evaluate his mental competence before the Government proceeds with his execution. The District Court below preliminarily enjoined Purkey's execution, finding that the evidence Purkey has put forth thus far established a likelihood of success on the merits of his claims. The Government now seeks a stay or vacatur of that preliminary injunction.

Such a stay is available "only under extraordinary circumstances." *Ruckelshaus* v. *Monsanto Co.*, 463 U. S. 1315, 1316 (1983) (Blackmun, J., in chambers); see also *Maryland* v. *King*, 567 U. S. 1301, 1302 (2012) (ROBERTS, C. J., in chambers) (listing stay factors). Accordingly, "[w]hen a

matter is pending before a court of appeals, it long has been the practice of Members of this Court to grant stay applications only 'upon the weightiest considerations.'" *Fargo Women's Health Org.* v. *Schafer*, 507 U. S. 1013, 1014 (1993) (O'Connor, J., concurring) (quoting *O'Rourke* v. *Levine*, 80 S. Ct. 623, 624 (1960)).  Given the District Court's thorough analysis, and the serious questions that court raised, I do not believe the Government has carried its "especially heavy" burden here. *Packwood* v. *Senate Select Comm. on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers).

The Government devotes much of its application to arguing that Purkey's complaint alleges "core habeas" claims that he was required to bring in his district of confinement, the Southern District of Indiana, rather than the district in which several federal officers responsible for his execution are located, the District of Columbia.  See, *e.g.*, Application for Stay or Vacatur 22.  That is not clearly correct: When an individual advances a *Ford* claim, "the only question raised is not whether, but when, his execution may take place." *Ford*, 477 U. S., at 425 (Powell, J., concurring) (emphasis deleted).  That seems to make Purkey's allegations more akin to a method-of-execution claim than a "core habeas" claim challenging the validity of his death sentence.  In any event, the Government's objection here is not that Purkey failed to raise a valid claim prohibiting his execution.  Instead, the Government quibbles principally with the venue in which Purkey filed that claim.  In this posture, that protest does not reflect an "extraordinary circumstanc[e]" that justifies overturning a preliminary injunction.  *Ruckelshaus*, 463 U. S., at 1316.  Nor does it support this Court's decision to shortcut judicial review and permit the execution of an individual who may well be incompetent.

Importantly, the Government does not appear to dispute that Purkey may advance his competency claims in a U. S. C. §2241 proceeding filed in the Southern District of

Indiana. It identifies no procedural barriers to such a suit. Indeed, the Government proposed that the District Court below transfer the case to the Southern District of Indiana because, in the Government's view, that is "the appropriate forum for [Purkey's] habeas action." Defendant's Motion to Dismiss in No. 1:19–cv–3570 (D DC), Doc. No. 18, p. 46; see also Defendant's Opposition to Plaintiff's Renewed Motion in No. 1:19–cv–3570 (D DC), Doc. No. 26, p. 10 (noting the Government's argument to "transfer the case to the Southern District of Indiana").[1] It is thus undisputed that there is a District Court in which Purkey may properly pursue his *Ford* claim and his request for a competency hearing.

Even if Purkey's suit advanced habeas claims properly pursued through a §2241 petition in his district of confinement, it would be far from clear that the District Court below lacked authority to issue a preliminary injunction while it considered Purkey's arguments more fully. As the District Court explained, it appears that "the question of the proper location for a habeas petition is best understood as a question of personal jurisdiction or venue" rather than of subject-matter jurisdiction. *Rumsfeld* v. *Padilla*, 542 U. S. 426, 451 (2004) (Kennedy, J., concurring); see also Order in No. 1:19–cv–3570 (D DC), Doc. No. 36, p. 9. Whether Purkey should have filed in the District of Columbia or the Southern District of Indiana, it would be passingly strange to maintain, in the final hours before his capital sentence is

_____

[1] To be sure, the Government maintains that if Purkey's claims sounded in habeas, the District Court below would have lacked jurisdiction over a necessary party to the habeas proceeding: the warden of the federal prison in Indiana where he is confined. Application for Stay or Vacatur 16–17. But the Government does not argue that any such jurisdictional problem would have persisted had Purkey simply filed his complaint in the Southern District of Indiana or if his case were to be transferred to that District. And the Government acknowledged below that "[a]t least one of the John Doe defendants" in this litigation was "the warden of [Purkey's] prison." Defendant's Motion to Dismiss in No. 1:19–cv–3570 (D DC), Doc. No. 18, p. 43.

to be carried out, that his selection of venue should automatically prevent him from developing what the District Court found to be a likely meritorious *Ford* claim and request for a competency hearing. At a minimum, the Government has not carried its "especially heavy" burden of demonstrating that its "core habeas" argument presents a jurisdictional impediment to the District Court's preliminary injunction.

The Government's remaining contentions are even less persuasive. In particular, the Government has not come close to showing that the District Court erred in finding Purkey likely to succeed on the merits of his *Ford* claim and his request for a competency hearing. As noted, a forensic psychiatrist who conducted an in-person evaluation of Purkey in late 2019 averred that "[i]n [his] opinion, to a reasonable degree of medical certainty, at the time of the evaluation, Mr. Purkey lacked a rational understanding of the basis for his execution." Purkey Psychiatric Report 11–12; see also *ibid.* ("He lacks a true understanding or rationality that the murder is the basis for his execution"). There is extensive evidence that Purkey earnestly and steadfastly believes that the Government plans to execute him not as punishment for murder, but in retaliation for his "protracted jailhouse lawyering" to expose prison abuses. Complaint in No. 1:19–cv–3570 (D DC), Exh. 15, Doc. No. 1–18, p. 12; see also, *e.g.*, Purkey Psychiatric Report 12 ("Mr. Purkey has a fixed belief that he is going to be executed in retaliation for his legal work, to prevent him from being a hassle for the government. This prevents him from having a rational understanding of the purpose of his execution"). Purkey even believes his counsel to be "part of the conspiracy against him and his efforts to litigate against the prison." Complaint in No. 1:19–cv–3570 (D DC), Exh. 5, Doc. No. 1–1, p. 16. Consistent with such evidence, individuals have described Purkey's history of delusions, hallucinations, and paranoia. See, *e.g.,* Purkey Psychiatric Report

9. And in 2019, Purkey was diagnosed with Alzheimer's disease. Complaint in No. 1:19–cv–3570 (D DC), Exh. 3, Doc. No. 1–1, pp. 1, 8–9. That is just a small snapshot of the thousands of pages of evidence Purkey has already put forth.

Against that extensive body of evidence, the Government principally maintains that the forensic psychiatrist, who unequivocally opined that Purkey lacked a rational understanding of the basis for his execution, was confused. See Application for Stay or Vacatur 24. According to the Government, the psychiatrist misinterpreted Purkey's failure to understand the reason for the scheduling of his execution as an inability to grasp the basis for his execution altogether. But even a cursory review of the psychiatrist's report reveals no such muddling of concepts. While the psychiatrist acknowledged that Purkey could "recite the fact that his execution is for the murder of Jennifer Long," the psychiatrist continued that Purkey "lacks rational understanding of that fact" and can only "parro[t]" it "rather than hav[e] a rational understanding" of it. Complaint in No. 1:19–cv–3570 (DDC), Exh. 1, Doc. No. 1–1, p. 13.

The Government then insists that, even accepting as true Purkey's evidence of "a history of mental illness" and "paranoid delusional thinking," such evidence "does not demonstrate incompetency under *Ford*." Application for Stay or Vacatur 27 (internal quotation marks omitted). But the question before the District Court at the preliminary-injunction stage was not whether Purkey conclusively is unable to comprehend the basis for his punishment. Instead, the District Court needed only conclude that Purkey would be likely to succeed in establishing a " 'substantial threshold showing' " of incompetence to warrant a competency hearing, *Panetti* v. *Quarterman*, 551 U. S. 930, 949 (2007) (quoting *Ford*, 477 U. S., at 426), or his actual incompetence to be executed. On this record, the District Court correctly concluded that Purkey met this preliminary burden. The

Government's cursory arguments regarding the ultimate merits of Purkey's claims do not reveal this case to be an "extraordinary" one justifying the Court's second-guessing of the District Court's highly factbound assessment. *Ruckelshaus*, 463 U. S., at 1316.

Finally, there can be no serious dispute that the remaining equitable considerations at issue heavily favor Purkey. Although the Government and the family members of the victim have a legitimate interest in punishing the guilty, that interest must be measured against Purkey's and the public's interest in ensuring that such punishment comports with the Constitution. At the same time, proceeding with Purkey's execution now, despite the grave questions and factual findings regarding his mental competency, casts a shroud of constitutional doubt over the most irrevocable of injuries.

\*　　\*　　\*

Because the Government has not satisfied its "especially heavy" burden of showing justification for staying or vacating the District Court's preliminary injunction, *Packwood*, 510 U. S., at 1320, I respectfully dissent.